**UNITED STATES of America**

v.

**Randall K. DYER, et al.**

**Crim. No. 90–00183–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 30, 1990.

Henry E. Hudson, U.S. Atty., Lawrence J. Leiser, Quincy L. Ollison, Asst. U.S. Attys., Geoffrey R. Brigham, Sp. Asst. U.S. Atty., Alexandria, Va., for the U.S.

John K. Zwerling, Alexandria, Va., for Randall K. Dyer.

Alan H. Yamamoto, Fairfax, Va., for Tobacco Accessories Distributing Co.

John A. Keats, Fairfax, Va., David B. Lamb, Washington, D.C., for Seyed–Ali Mortazavi, Lynn K. Mortazavi and Lynx Enterprises, Inc.

Nina J. Ginsburg, Alexandria, Va., for Page E. Wiencek.

R. Stanley Powell, Alexandria, Va., for RPM Associates, Inc.

Jonathan Shapiro, Alexandria, Va., for William L. Love.

Peter D. Greenspun, Fairfax, Va., for John Burgess Dragon Song, Ltd.

William B. Moffitt, Alexandria, Va., for Robert T. Vaughn.

Drewry Hutcheson, Alexandria, Va., for American Pipe & Tobacco Council.

Joe Wiggs, Alexandria, Va., Henry Asbill, Timothy Junken, L. Barrett Boss,

Washington, D.C., for Peter R. Wolfe, Chryssa E. Wolfe and Progressive Plastics, Inc.

Seymour Glanzer, Washington, D.C., for Roger Graham, Barbara M. Graham and Odyssey Glass Corp.

## MEMORANDUM OPINION

ELLIS, District Judge.

The government's original 302 Count, sixty-nine-page indictment against alleged drug paraphernalia manufacturers, distributors and retailers, and their trade association represents one of the first criminal prosecutions in the nation under the Mail Order Drug Paraphernalia Act, 21 U.S.C. § 857.[1] Not surprisingly, then, this prosecution raises questions, unresolved in this circuit, concerning the construction and constitutionality of this law. Recorded here is the Court's resolution of these and other issues raised by the parties' pre-trial motions. Specifically, the issues addressed are

(1) whether § 857 includes a scienter requirement and, if so, the nature of that requirement;

(2) whether § 857 is unconstitutionally vague;

(3) Whether § 857 reaches the conduct of drug paraphernalia retailers as alleged in the indictment;

(4) whether portions of the indictment should be dismissed as multiplicious; and

(5) whether the indictment should be dismissed on the ground of grand jury abuse.

### I. Factual Background

The indictment is lengthy and detailed. Eighteen defendants are named. They fall generally into four categories. The first three consist of individuals and businesses engaged in the (i) manufacture, (ii) distribution, and (iii) retail sales of "drug paraphernalia."[2] The fourth category consists of two entities: (1) the American Pipe & Tobacco Council ("APTC"), in effect the defendants' trade association, and (2) Robert T. Vaughn, APTC's executive director and legal adviser. Figure 1 (see Appendix A) identifies the eighteen original defendants and depicts their commercial relationships.

In essence, the indictment can be viewed as made up of five sections. The first, consisting of Count 1, charges all defendants with conspiracy to violate the federal drug paraphernalia laws in violation of 18 U.S.C. § 371. More particularly, the indictment charges that all defendants conspired in two respects: (i) to make use of the postal service and other interstate conveyances, namely United Parcel Service ("UPS"), as part of a scheme to sell drug paraphernalia in violation of § 857(a)(1), and (ii) to offer drug paraphernalia for sale and transportation in interstate commerce in violation of § 857(a)(2). Further, the indictment alleges that defendants used various means to carry out the conspiracy, including the maintenance of APTC as an organization to advise defendants and others on how to continue selling drug paraphernalia in violation of the law.

The second section of the indictment consists of Counts 2 through 149, in which various defendants are charged with using the mails and other interstate conveyances, namely UPS, as part of a scheme to sell drug paraphernalia. Each of the counts in this section relates to a single invoice from a manufacturer to a wholesaler or a retailer concerning some item or items of alleged drug paraphernalia mailed or shipped via

---

1. Although this proceeding is among the first § 857 prosecutions, federal courts have applied the section in the context of search warrants and forfeiture actions. *See United States v. 57,-261 Items of Drug Paraphernalia,* 705 F.Supp. 1256 (M.D.Tenn.1988), *aff'd,* 869 F.2d 955 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *United States v. Glass Menagerie, Inc.,* 721 F.Supp. 54 (S.D.N.Y.1989); *United States v. Main Street Distributing, Inc.,*

700 F.Supp. 655 (E.D.N.Y.1988); *Ryers Creek Corp. v. Steven M. MacMartin, et al.,* Decision and Order, CIV–89–157T, 1989 WL 231304 (W.D.N.Y. Apr. 20, 1989); *Marco and Penny Garzon v. Richard A. Rudin,* No. 87–C–1046, 1990 WL 204224 (E.D.Wis. Feb. 2, 1990).

2. The indictment adopts the definition of "drug paraphernalia" found in §§ 857(d) and (e). *See* Part II.A., *infra.*

UPS. Specifically, Counts 2–29 are invoices of Progressive Plastics, Inc., a manufacturer, concerning the mailing of alleged drug paraphernalia to wholesaler Tobacco Accessories Distributing Company ("Choice Supply"). Counts 30–70 are invoices of the manufacturer Odyssey Glass concerning alleged drug paraphernalia mailed either to wholesaler Choice Supply or to retailer RPM Associates, Inc. (d/b/a Penguin Feather). Counts 71–95 are invoices of the wholesaler Choice Supply concerning alleged drug paraphernalia shipped via UPS to retailer Penguin Feather. Next, Counts 96–127 reflect Choice Supply invoices concerning UPS shipments of alleged drug paraphernalia to Dragon Song, Ltd. Finally, Counts 128–49 relate to Choice Supply invoices of UPS shipments of alleged drug paraphernalia to retailer Octopus Garden, a sole proprietorship of defendant William L. Love.

The third section of the indictment consists of Counts 150–238. In these counts various of the defendants are charged with unlawfully offering drug paraphernalia for sale and transportation in interstate commerce in violation of 21 U.S.C. § 857(a)(2). Here again, each count refers to a single invoice reflecting a sale of alleged drug paraphernalia to one of the three defendant retailers from the wholesaler, Choice Supply.[3]

In the fourth section of the indictment, consisting of Counts 239–302, various defendants are charged with illegal money laundering or with aiding and abetting such money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2. Thus, Counts 239–49 charge the manufacturer Odyssey Glass and its two principals, Roger and Barbara Graham, with depositing funds in a financial institution, knowing that such funds represented proceeds from illegal activities, namely violations of § 857(a)(1) and (2). These same counts charge Choice Supply and its principal,

Randall Dyer, with aiding and abetting the money laundering. Each count represents a single deposit of a Choice Supply check, and hence each count is a separate money laundering charge and a separate aiding and abetting charge.[4] Similarly, each of the Counts 250–59 represents a single deposit and hence a separate money laundering charge against the manufacturer Progressive Plastics and its principals, Peter and Chryssa Wolfe, and separate aiding and abetting charges against Choice Supply and Dyer for Counts 250–52 and 254–59 and against Dragon Song and its principal, John Burgess, for Count 253. The remaining counts follow the same pattern. The manufacturer, wholesaler or retailer making deposits of funds derived from alleged violations of § 857(a)(1) or (a)(2) is charged with a separate money laundering count for each deposit. And for each money laundering charge, there is an aiding and abetting charge against the entity that paid the funds.[5]

The fifth and final section of the indictment sets forth the forfeiture allegations relating to the various defendants. In this regard, the Court granted the government's request for bifurcation of the trial. *See United States v. Dyer, et al.,* Crim. No. 90–000183–A (Order dated August 10, 1990).

It now appears that there will be no trial on this indictment. Of the original eighteen defendants, twelve have entered pleas. Defendants Progressive Plastics, Inc. and Peter Wolfe, president and owner of Progressive Plastics, entered pleas of guilty to Count 1 of the indictment charging all defendants with conspiracy to violate § 857. Defendants Odyssey Glass Corporation and Roger and Barbara Graham, president and secretary-treasurer, respectively, of Odyssey Glass, also entered pleas of guilty to Count 1, as did defendants Tobacco Accessories Distributing Company and Randall K. Dyer, its president, RPM Associates,

---

**3.** The Court subsequently granted the government's motion to dismiss Counts 223 and 228 entirely and Counts 172 through 177 as to defendants RPM Associates, Inc. and Page E. Wiencek only.

**4.** The Court subsequently granted the government's motion to dismiss Count 245.

**5.** The Court subsequently granted the government's motion to dismiss Count 293.

Inc., and its president, Page E. Wiencek, Dragon Song, Ltd. and its president, John Burgess, and William L. Love, sole proprietor of Octopus Garden. Charges against defendants Chryssa Wolfe, Robert T. Vaughn, and American Pipe and Tobacco Council were dismissed on the government's motion. Also, on the government's motion, charges against defendants Seyed–Ali Mortazavi, Lynn K. Mortazavi, and Lynx Enterprises, Inc. were dismissed without prejudice, over the objection of these defendants.

## II. *Scienter*

■ Scienter is typically central to criminal liability. *See Morrissette v. United States,* 342 U.S. 246, 250–52, 72 S.Ct. 240, 243–44, 96 L.Ed. 288 (1952). So embedded in the law is this principle that "[a]bsent indication of contrary purpose in the language or legislative history of [a] statute," scienter is presumed to be an element of any federal crime. *Liparota v. United States,* 471 U.S. 419, 425, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985). On this general principle, the parties agree. Indeed, they do not dispute that § 857 includes some sort of a scienter requirement. What is sharply disputed is the nature of that requirement. Specifically, the parties dispute whether the statute's definition of "drug paraphernalia" as any item "primarily intended or designed" for use with illicit drugs embodies an objective or subjective scienter standard.[6] 21 U.S.C. § 857(d). Defendants contend that the statute requires proof of a specific mental state with respect to an item before that item constitutes drug paraphernalia. Thus, they contend that the government cannot establish a § 857 violation unless it proves that defendants subjectively intended that an item they offered for sale was to be used with controlled substances or that defendants themselves designed the item for use with illegal drugs. In contrast, the government argues that the scienter requirement is objective: an item is drug paraphernalia if, by virtue of its physical characteristics and/or surrounding circumstances, it is apparent that the item is primarily intended or designed for illegal drug use. In the government's view, a violation of the statute can be established without a showing that defendants subjectively intended that an item be used with illegal drugs. Instead, a demonstration that a defendant knowingly utilized interstate conveyances to attempt to sell an item subsequently determined, based on objective evidence, to be primarily intended or designed for use with illegal drugs would suffice for criminal liability.

By Order dated August 16, 1990, this Court responded in preliminary fashion to defendants' claim that the government must come forward with evidence of subjective intent to sell drug paraphernalia and to the government's claim that it need not do so. In that Order, the Court ruled that "§ 857 does not require proof of a defendant's subjective intent with respect to an item, but rather depends upon the objective character and nature of the item and the descriptions and circumstances set forth in §§ 857(d) and (e)."[7] In essence, the Order set forth only the minimum showing required of the government under § 857 to prove the existence of drug paraphernalia. This Memorandum Opinion

---

**6.** Although the parties disagree on the nature of the scienter standard required by the definition in subsection (d), they do not dispute that subsection (a) of the statute, the offense section, requires proof that a defendant intended (i) to use an interstate conveyance to sell items found to be drug paraphernalia, (ii) to offer such items for sale in interstate commerce, or (iii) to import or export such items. *See United States v. Main Street Distributing, Inc.,* 700 F.Supp. 655, 666 (E.D.N.Y.1988) (citing *Levas and Levas v. Village of Antioch,* 684 F.2d 446, 450 (7th Cir. 1982)).

**7.** The Order further stated as follows:

But the government must show that a defendant had knowledge of the character and nature of the items alleged to be "drug paraphernalia." To establish violations of § 857(a)(1) and § 857(a)(2), the government must also show (i) for (a)(1), that a defendant knowingly made "use of the services of the Postal Service or other interstate conveyance as part of a scheme to sell drug paraphernalia" and (ii) for (a)(2), that a defendant knowingly "offer[ed] for sale and transportation in interstate or foreign commerce drug paraphernalia."

*United States v. Dyer,* Crim. No. 90–000183–A, slip op. at 1–2, dated August 16, 1990.

elaborates on the Order and explores some remaining contours of the statute. The analysis concludes that the overall § 857 standard is objective in the sense that the government need not prove a defendant's subjective intent in order to establish criminal liability under the statute. In some situations a violation may be established solely by reference to design features or objective circumstances, provided that the government shows the defendant's awareness of the general nature of the object. A defendant, of course, remains free to contest the government's proof with her or his own objective facts.[8]

### A. Statutory Language

The search for the nature of § 857's scienter requirement appropriately begins with the statutory language. *Howe v. Smith*, 452 U.S. 473, 101 S.Ct. 2468, 69 L.Ed.2d 171 (1981); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539 (1975) (Powell, J., concurring); *Baltimore Gas & Electric Co. v. Heintz*, 760 F.2d 1408, 1413 (4th Cir.) (stating that courts' process of statutory construction consists of looking first to a statute's language, then to legislative history and the interpretation given by an administering agency if applicable), *cert. denied*, 474 U.S. 847, 106 S.Ct. 141, 88 L.Ed.2d 116 (1985). Three subsections of the statute are pertinent. First, § 857(d)

defines the term "drug paraphernalia" as "any equipment, product, or material of any kind which is *primarily intended or designed for use*" in connection with illicit drugs (emphasis added). This subsection goes on to note that "drug paraphernalia" includes fifteen specific categories of objects.[9] Second, § 857(e) states that "[i]n determining whether an item constitutes drug paraphernalia, in addition to all logically relevant factors," a list of eight factors "may be considered."[10] Finally, § 857(f) provides two exemptions: the first, for persons "authorized by local, State, or Federal law to manufacture, possess, or distribute such items," § 857(f)(1), and the second, for "any item that, in the normal lawful course of business, is imported, exported, transported, or sold through the mail or by any other means, and traditionally intended for use with tobacco products, including any pipe, paper, or accessory," § 857(f)(2). These provisions, individually and collectively, point persuasively to the conclusion that § 857 incorporates an objective scienter standard.

### 1. "Designed for Use"

■ In choosing the phrase "designed for use," Congress made clear its intent to adopt an objective standard. This means the government may attack a particular object as drug paraphernalia solely on the basis of its design.[11] And "designed for

---

**8.** Beyond the scope of this Memorandum Opinion is the extent to which the government may rely on evidence of a defendant's subjective intent, and the extent to which defendants may also offer evidence of their subjective intent in certain circumstances.

**9.** The categories are: "(1) metal, wooden, acrylic, glass, stone, plastic, or ceramic pipes with or without screens, permanent screens, hashish heads, or punctured metal bowls; (2) water pipes; (3) carburetion tubes and devices; (4) smoking and carburetion masks; (5) roach clips: meaning objects used to hold burning material, such as a marihuana cigarette, that has become too small or too short to be held in the hand; (6) miniature spoons with level capacities of one-tenth cubic centimeter or less; (7) chamber pipes; (8) carburetor pipes; (9) electric pipes; (10) air-driven pipes; (11) chillums; (12) bongs; (13) ice pipes or chillers; (14) wired cigarette papers; or (15) cocaine freebase kits."

**10.** These factors are: "(1) instructions, oral or written, provided with the item concerning its use; (2) descriptive materials accompanying the item which explain or depict its use; (3) national and local advertising concerning its use; (4) the manner in which the item is displayed for sale; (5) whether the owner, or anyone in control of the item, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products; (6) *direct or circumstantial evidence of the ratio of sales of the item(s) to the total sales* of the business enterprise; (7) the existence and scope of legitimate uses of the item in the community; and (8) expert testimony concerning its use."

**11.** This follows from the section's use of the disjunctive in the phrase "primarily intended or designed." *Cf. Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1366–67 (10th Cir.1981) (stating with regard to state statute in which definition of drug paraphernalia is stated in the disjunctive

use" indicates that objective evidence will satisfy the statutory scheme, for the "design" of an item can only be analyzed by reference to its objective, physical characteristics. More specifically, the "designed for use" standard reflects Congress' intent to identify those items of "hard core" drug paraphernalia that are the chief focus of this prosecution and which, by virtue of their physical characteristics, serve no legitimate, non-contrived uses.[12] Because these items may be identified by their physical characteristics and design features, there is no need for a demonstration of the defendant's subjective intent. Where the illicit purpose of the manufacturer or designer is embodied in the object itself, that purpose is apparent to all who perceive the object.[13] "All that is required is for persons to open their eyes to the 'objective realities' of the items sold in their businesses." *Garner v. White*, 726 F.2d 1274, 1282 n. 8 (8th Cir.1984) (quoting *The Casbah,*

*Inc. v. Thone*, 651 F.2d 551, 561 (8th Cir. 1981), *cert. denied*, 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982)).

Other courts construing the "designed for use" language in various drug paraphernalia ordinances and statutes have reached similar conclusions. *Village of Hoffman Estates v. The Flipside, Hoffman Estates*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) is the most prominent example. There, the Supreme Court considered the constitutionality of a drug paraphernalia ordinance that required businesses to obtain a special license if they sold items "designed or marketed for use" with illegal drugs. Focusing on the phrase "designed for use," the Court reasoned that "the standard encompasses at least an item that is principally used with illegal drugs by virtue of its objective features." *Id.,* 455 U.S. at 501, 102 S.Ct. at 1195;[14] *see also Garner v. White*, 726 F.2d at 1282 (language "designed to be primarily use-

---

that "[a]n item may constitute drug paraphernalia if any one of the ... standards is met").

12. For example, in hearings on a predecessor bill to § 857, the principal author of the Model Drug Paraphernalia Act (hereafter "Model Act"), which was promulgated by the Department of Justice in 1979 and contains both "designed for use" and "intended for use" language, explained in detail why a "bong" is hard core drug paraphernalia by virtue of its physical features. The particular features of a "bong" dictate that it has no alternative uses that are not highly contrived (e.g., filling it with water and adding flowers). *See Mail Order Drug Paraphernalia Control Act, Hearing on H.R. 1625 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 99th Cong., 2d Sess. 66–69 (1986) (testimony of Harry Myers, Office of General Counsel, Drug Enforcement Administration) (hereafter "Hearings"); *see also United States v. Main Street Distributing, Inc.,* 700 F.Supp. 655, 661 (E.D.N.Y. 1988) (stating "The Mail Order Drug Paraphernalia Act was apparently derived from [the] Model Drug Paraphernalia Act"). Mr. Myers also stated that a "bong" "is drug paraphernalia without regard to who is holding it, or what my intent is; this is drug paraphernalia strictly because of its design, the hard core drug paraphernalia...." Hearings at 66. He added that "[i]t is not necessary to show ... intent for someone who is selling something that is designed for use with drugs. You could place the burden on manufacturers and place a burden on merchants to know what it is they are selling." *Id.* at 69. This is precisely what Congress did in § 857. *See also id.* at 52 (remarks of Rep.

Rangel) (stating that the proposed law "specifically target[ed] hardcore drug paraphernalia which [could] only be used with controlled substances").

13. To this extent, the language "intended for use" may be merely synonymous with "designed for use," because an object's intended usage may be manifest by its design features. *See, e.g., United States v. 57,261 Items of Drug Paraphernalia,* 869 F.2d 955, 958 (6th Cir.1989) (affirming district court decision, made on the basis of expert testimony and consideration of design features, that certain items were "intended for use with controlled substances" in the American drug culture), *cert. denied*, — U.S. —, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989); *Florida Businessmen for Free Enterprise v. City of Hollywood,* 673 F.2d 1213, 1219 (11th Cir.1982) (holding that "the designer's intent for a design is reflected by the objective physical characteristics of the finished product"). "Intended for use" may also apply more broadly to multi-purpose items that are not identifiable as drug paraphernalia by design, but are nevertheless marketed for use in conjunction with illegal drugs. *See* Part II.G., *infra.*

14. The Supreme Court also opined that the language "marketed for use" should be determined objectively. In support of this conclusion, the Court noted that the guidelines accompanying the ordinance referred to the manner of display of the items and their proximity to items not covered by the statute as factors relevant to the inquiry under "marketed for use." *See Hoffman Estates,* 455 U.S. at 502, 102 S.Ct. at 1195.

ful" referred to the "objective, structural characteristics" of the paraphernalia); *High Ol' Times, Inc. v. Busbee,* 673 F.2d 1225, 1230–31 (11th Cir.1982) ("designed for use" in a state paraphernalia law referred to "the intent of the designer ... as manifested by the objective physical characteristics of the item"); *Hejira Corp. v. MacFarlane,* 660 F.2d at 1362 (word "designed" in state drug paraphernalia statute "is clear in its meaning, which is that the item is predetermined for a particular use"); *High Gear and Toke Shop v. Beacom,* 689 P.2d 624, 632 (Colo.1984) (*en banc*) (word "designed" in state statute referred to "the objective features of an item").[15]

### 2. *§ 857(d) Examples*

The conclusion that § 857 embodies an objective scienter standard is buttressed by the fact that the statute includes a list of fifteen specific items or groups of objects. *See* 21 U.S.C. § 857(d). By use of the language "['drug paraphernalia'] includes items primarily intended or designed for use in ... introducing [controlled substances] into the human body, *such as,"* § 857(d) (emphasis added), Congress unmistakably meant to identify the listed items as examples of drug paraphernalia. *See, e.g., Ryers Creek Corp. v. MacMartin,* No. 89–157T, slip op. at 6 (W.D.N.Y. April 20, 1989) (stating with reference to § 857(d) that "Congress expressly included smoking pipes in the definition of drug paraphernalia"). Moreover, § 857(d) describes most of the listed items in language that highlights the substances from which they are made

or other physical characteristics: e.g., "punctured metal bowls," "electric pipes," "air-driven pipes," "wired cigarette papers," and "miniature spoons with level capacities of one-tenth cubic centimeter or less." The listing is a statement of Congress' finding that these items by their nature are conclusively intended or designed for illicit purposes.[16] The list would be unnecessary, indeed inappropriate, had Congress intended a purely subjective scienter standard, for in that event any item could be saved by virtue of a defendant's innocent, subjective purpose. Thus, provided the government can show that the particular item in question is a "bong," "chillum," or some other object listed in § 857(d), Congress has expressly designated these items as drug paraphernalia regardless of a defendant's subjective intent.

### 3. *Statutory Factors and Tobacco Exclusion*

The presence of an objective standard is further made manifest by §§ 857(e) and (f). Section 857(e) provides a non-exhaustive list of eight factors that may be considered in the determination of what is "drug paraphernalia." While these are not the only relevant factors, it is no accident that each of them focuses on objective indicia (e.g., licensing status, ratio of sales, expert testimony), factual information (instructions or descriptive materials accompanying the item) or the actual surroundings of the item in question. All eight factors are objective in nature; none implicates, or requires consideration of, a defendant's subjective intent.[17]

---

**15.** An objective standard has also been employed in analogous criminal contexts. For example, 15 U.S.C. § 1171(a) defines a "gambling device" in part as any machine or mechanical device "designed and manufactured primarily for use in connection with gambling." To interpret this phrase courts have looked to the physical characteristics of the device in question, not the subjective intent of the designer or manufacturer. *See, e.g., United States v. 294 Various Gambling Devices,* 718 F.Supp. 1236, 1242–46 (W.D.Pa.1989); *United States v. 16 Electronic Gambling Devices,* 603 F.Supp. 32, 34 (D.Haw.1984) (stating "[w]hether a machine was 'designed and manufactured primarily for use in connection with gambling' ... can be determined by examining its characteristics or features").

**16.** Defendants contend that the listing of certain items in § 857(d), such as wooden pipes, precludes an objective scienter standard. Without a subjective standard, they argue, traditional tobacco pipes nonsensically would be swept within the ambit of the Act. This argument ignores the various aspects of § 857, such as the exception for items "traditionally" used with tobacco contained in § 857(f) and the factors listed in § 857(e), which distinguish between tobacco accessories and drug paraphernalia by reference to objective criteria.

**17.** It may be argued that oral or written instructions or descriptive materials, as examples of expression, are indicative of a defendant's subjective intent in a way that sales ratios and

Section 857(f)(2) provides an exemption from the scope of "drug paraphernalia" for items "traditionally intended for use with tobacco products." In a 1988 amendment to the statute Congress substituted the phrase "traditionally intended for use with" for the then existing phrase "primarily intended for use with." Congress' choice of the modifier "traditionally" confirms the statute's objective standard because that term reaches beyond a defendant's mental state. An item can only be "traditionally intended for use with" tobacco by reference to history, past practice, and other objective factors. Congress also indicated that the 1988 amendment was added only as a "clarification" of the original language, which further confirms that "primarily intended for use" incorporated an objective element. *See* 102 Stat. 4384 (1988).[18]

B. Structure

A statute's structure is an important independent guide to its construction. It is settled that courts "[i]n determining the meaning of the statute ... look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, — U.S. —, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); *see also Kokoszka v. Belford*, 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374 (1974); *Food Town Stores, Inc. v. E.E.O.C.*, 708 F.2d 920, 924 (4th Cir.1983) ("We are mindful that in interpreting a statute, we ... must look to the provisions of the whole law"), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984).

Here, the persuasive force of § 857's separate elements is magnified by considering the statute's overall design. This design is inconsistent with a purely subjective standard. The statute first provides a definition and enumerates examples of drug paraphernalia. Next, it sets forth various objective factors to be assessed, followed finally by specific, objectively based exclusions. The entire structure focuses on the items of drug paraphernalia, not on the purposes of the defendant. Use of a purely subjective standard would nullify the explicit structure and language of the statute. Had Congress meant the determination of what is drug paraphernalia to turn solely on the subjective intent of the defendant, there would be no reason to list specific examples of prohibited items. Nor, in this event, would the objectively determined criterion "traditionally" have been used in the § 857(f) exemption.

Similarly, Congress would not have prohibited importation of drug paraphernalia, as it did,[19] if it had intended a subjective scienter standard. Congress clearly envisaged Customs Service agents seizing items of paraphernalia at borders based on the objective features of the items, not on the subjective intent of a foreign exporter or manufacturer. A subjective standard would render this aspect of the Act relatively ineffective, if not unworkable. Had Congress intended to incorporate subjective intent it would surely have chosen a statutory structure defining a liable party as "any person who, intending that an item be used in connection with controlled substances, either imports, exports, offers that

licensing status are not. While this may be true, it is not a persuasive argument for a subjective standard. A defendant may or may not have written the instructions or descriptive materials. Moreover, when considered as a factor in the determination of an item's character as "drug paraphernalia," what a defendant said or wrote is a matter of fact that bears on an item's designed or intended use. In any event, § 857(e), significantly, does not specify as a factor, for example, "defendant's testimony as to his intent."

**18.** The impetus for this clarifying amendment apparently came from tobacconists concerned that the original exemption language "primarily

intended for use" created an objective standard broad enough to reach their sales of pipes and paper. No clarification would have been necessary had the original language been viewed as creating a subjective standard. By using the modifier "traditionally" to clarify the scope of the exemption, Congress, by implication, thereby indicated its view that the original language, and the statute in general, did not embody a subjective standard.

**19.** *See* 21 U.S.C. § 857(a)(3) ("It is unlawful for any person— ... (3) to import or export drug paraphernalia").

item for sale in interstate or foreign commerce, or makes use of any interstate conveyance as part of a scheme to sell that item." With this language, Congress would then have had no need for separate statutory sections listing examples, identifying objective factors to be taken into account, and defining certain exclusions. In effect, a judicially imposed subjective approach would amend the statute to define "drug paraphernalia" as any item "primarily intended or designed for use [with drugs] *by the defendant.*" Of course, the actual statutory language noticeably omits any such qualifying phrase. And the invitation to read it into the statute must be declined, for it is contrary to the statute's overall design and structure.[20]

## C. Legislative History

As a general matter, when a statute is clear and unambiguous, a court's interpretive inquiry comes to an end. *See, e.g., Sullivan v. Stroop,* —— U.S. —— 110 S.Ct. 2499, 2502–03, 110 L.Ed.2d 438 (1990); *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981). Absent a clearly expressed legislative intention to the contrary, the language of a statute must be considered conclusive. *Burlington Northern Railroad Co. v. Oklahoma Tax Commission,* 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987); *United States v. James,* 478 U.S. 597, 606, 106 S.Ct. 3116, 3121–22, 92 L.Ed.2d 483 (1986). In the case of § 857, the statutory language is reasonably clear, but the legislative history is at best ambiguous [21] and therefore not particularly helpful in the quest for the statute's meaning.

■ Defendants attempt to support their claim for a subjective scienter standard by citing remarks Representative Levine made

at a subcommittee hearing with regard to a bill that was a predecessor to § 857. At the hearing, Representative Levine stated that the intent referred to in the language of this predecessor bill was that of the particular defendant, regardless of his status as manufacturer or retailer. *See* Hearings at 48. Mr. Levine's conclusory remarks are themselves not free from ambiguity. Not directly addressed, for example, is whether a guilty verdict must be based on a jury finding that a defendant subjectively intended or designed an item for use with drugs. In any event, Mr. Levine's remarks are not sufficient to overcome the plain language of the statute, for "[s]tray comments by individual legislators, not otherwise supported by statutory language or committee reports, cannot be attributed to the full body that voted on the bill." *In re Kelly,* 841 F.2d 908, 912 n. 3 (9th Cir.1988); *see also South Carolina Educ. Assoc. v. Campbell,* 883 F.2d 1251, 1262 (4th Cir.1989) (stating "[i]t is axiomatic that if motivation is pertinent, it is the motivation of the entire legislature, not the motivation of a handful of voluble members, that is relevant"), *cert. denied,* —— U.S. ——, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990); *Beattie v. United States,* 756 F.2d 91, 95 (D.C.Cir.1984) (exact choice of words in bill is due greater reliance than oral testimony committee hearing); *see generally Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring) (stating "[t]he meaning of terms on the statute books ought to be determined, not on the basis of which meaning can be shown to have been understood by a larger handful of the Members and Congress; but rather on the basis of which meaning is (1) most in accord with the context and ordinary usage

---

**20.** Congress is well aware of the language required to indicate subjective intent. In fact, other sections of the Anti–Drug Abuse Act of 1986, of which § 857 is a component, show that Congress was careful to specify subjective intent when it desired that standard. *See, e.g.,* § 1841 ("it shall be unlawful to ... manage ... any building ... and *knowingly and intentionally* rent ... for the purpose of unlawfully manufacturing [a controlled substance]") (emphasis added).

**21.** This situation is at least as surprising as it is disappointing, given the importance of the nature of scienter to the operation of the statutory scheme. The paucity of focused legislative history accompanying § 857, including the absence of committee reports concerning the final bills, militates against according decisive weight to the existing legislative history.

... and (2) most compatible with the surrounding body of law into which the provision must be integrated").[22]

Nor is the legislative history one-sided; it also contains statements supportive of an objective scienter standard. These statements refer to drug paraphernalia in terms of specific items and physical characteristics independent of a defendant's intent. For example, Senator Wilson, sponsor of the final version of the statute in the Senate, delivered floor remarks in which he identified "bongs," "chillums," "roach clips," and cocaine kits and spoons as particular "devices" of drug paraphernalia to be prohibited. *See, e.g.,* 131 Cong.Rec. 5828–29 (March 20, 1985). In addition, the most recent legislative history, Congress' 1988 substitution of the word "traditionally" for "primarily" in the tobacco exclusion, points persuasively to an objective scienter standard. In sum, defendants cannot rely on § 857's meager and ambiguous legislative history to override the statute's terms and structure.

D. Purpose

Settled canons of statutory construction hold that a statute's underlying purpose is an important interpretive guide. *See United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *United States v. Morton,* 467 U.S. 822, 833, 104 S.Ct. 2769, 2775–76, 81 L.Ed.2d 680 (1984) (examining statutory language, history,

and purpose in sequence); *United Hospital Center, Inc. v. Richardson,* 757 F.2d 1445, 1451 (4th Cir.1985) ("it is the court's task to 'interpret the words of the statute in light of the purposes the Legislature sought to serve'") (quoting *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979)); *Food Town Stores, Inc. v. Equal Employment Opportunity Commission,* 708 F.2d at 924 (stating "[a] statute must be interpreted to give it the single, most harmonious, comprehensive meaning possible in light of the legislative policy and purpose").

There can be no serious dispute about § 857's overall purpose. If the legislative history reveals anything, it makes clear Congress' overarching intent that the statute serve as a frontal assault by the Federal Government on the drug paraphernalia industry in this country. *See, e.g.,* 131 Cong.Rec. 5828–29 (March 20, 1985) (remarks of Sen. Wilson); 132 Cong.Rec. H6655–6656 (1986) (remarks of Rep. Levine); 132 Cong.Rec. S13757–58 (September 26, 1986) (remarks of Sen. Wilson); 132 Cong.Rec. S16501 (October 15, 1986) (remarks of Sen. Wilson); Hearings at 74–76 (remarks of Rep. Gilman); *Id.* at 194–99 (remarks of Rep. Rangel). In enacting § 857, Congress plainly intended to cast a wide net to reach the broadest possible scope of items that are designed or marketed as drug paraphernalia.[23] This purpose

---

**22.** Justice Scalia's antipathy to the use of legislative history as an interpretive guide is well documented. *See, e.g., Hirschey v. FERC,* 777 F.2d 1, 7–8 (D.C.Cir.1985) (stating that it is "time for courts to become concerned about the fact that routine deference to the detail of committee reports, and the predictable expansion in that detail which routine deference has produced, are converting a system of judicial construction into a system of committee-staff prescription"); *FAIC Sec., Inc. v. United States,* 768 F.2d 352, 361–62 (D.C.Cir.1985) (Scalia, J.) (stating that even "[t]he best legislative history" is but one "clue as to what the legislating 'party' had in mind").

Justice Kennedy has expressed similar views. *See Public Citizen v. Department of Justice,* —— U.S. ——, 109 S.Ct. 2558, 2576–78, 105 L.Ed.2d 377 (1989) (Kennedy, J., concurring).

For criticism of Justice Scalia's views, *see* Note, *Justice Scalia's Use of Sources in Statutory*

*and Constitutional Interpretation: How Congress Always Loses,* 1990 Duke L.J. 160 (1990).

**23.** *Cf. Stoianoff v. State of Montana,* 695 F.2d 1214, 1220 (9th Cir.1983) ("A definition which casts a wide net is necessary to accomplish the objectives" of a state drug paraphernalia statute based on the Model Act); Comment to Model Act Article I ("Although this definition [of drug paraphernalia] may appear too general in its wording, or too broad in its scope, there are so many forms of drug paraphernalia that any attempt to define the term in more specific language would guarantee major loopholes in the Act's coverage.") (reprinted in Hearings at 186); *Hejira Corp. v. MacFarlane,* 660 F.2d at 1356, 1361 ("At the outset, we recognize that the subject matter and object of this [state drug paraphernalia statute based on the Model Act] is to aid in curtailing drug use by prohibiting the sale, possession and advertisement of devices

is advanced by an objective scienter standard, but frustrated by a subjective one. Simply put, proving design is easier than proving subjective intent. Under an objective standard there is no need to probe a defendant's mind for an illicit purpose. Instead, the government may show that an item is drug paraphernalia by reference to the item itself and its objective characteristics. A jury presented with objective evidence and instructed on an objective standard is not likely to be fooled or confused. In contrast, a purely subjective approach encourages charades and stratagems on the part of drug paraphernalia merchants seeking to obscure their true intent. For example, a paraphernalia merchant seeking to hide his true intent might succeed under a subjective standard merely by putting tobacco in a bong or, as occurred here, by labeling a bong "The Tobaccomaster." Such a ploy, while strictly speaking also relevant under an objective standard (*see* § 857(e)(4)), is likely to be less probative under that standard than under a subjective standard. Under § 857(d), an item, shown by competent expert testimony to be a bong, is prohibited paraphernalia whether or not it is sold containing tobacco, and whether or not it is creatively or deceptively labeled. In sum, an objective scienter standard for § 857 is consistent with the statute's purpose of serving as an effective weapon against illegal drugs generally and against the drug paraphernalia industry in particular.

### E. Authorities

The nature of the scienter requirement of § 857 is a question of first impression in this circuit and elsewhere. No court has squarely decided the precise scienter necessary for criminal liability under § 857. Even so, there are § 857 decisions and decisions based on state statutes derived from the Model Act that bear on the scienter question. The implications of these cases for the nature of § 857 scienter are not uniform, but the most persuasive of them point to an objective standard.

which tend to facilitate, enhance, condone, and

Most prominently, as noted above the Supreme Court in *Hoffman Estates* held that the language "designed for use" encompasses items that are primarily used with illegal drugs by virtue of their structural design features. In reaching this conclusion, the Court found persuasive that the guidelines accompanying the ordinance, much like § 857(d), referred to "paper of colorful design," "roach clips," and other specific items as conclusively designed for illegal use. In the Court's view, the guidelines helped clarify and ameliorate any ambiguity in the term "design." *See* 455 U.S. at 500–501 & n. 18, 102 S.Ct. at 1194–95 & n. 18. Similarly, the Court noted that the guidelines referred to the manner of display of paraphernalia and to the proximity of covered items to otherwise uncovered items, a criterion almost identical to § 857(e)(4). Again, the Court viewed this aspect of the guidelines approvingly as calling for an objective measure of proof and as providing Flipside with ample warning that its activities required a license. *See id.* at 502, 102 S.Ct. at 1195.

Even more closely on point is *United States v. 57,261 Items of Drug Paraphernalia*, 705 F.Supp. 1256 (M.D.Tenn.1988), *aff'd*, 869 F.2d 955 (6th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). There, the district court implicitly employed an objective standard in determining whether certain merchandise was subject to seizure as drug paraphernalia under § 857. Specifically, the court found that "[t]he government ... provided substantial and convincing evidence that the primary use, in this country, for items like the ceramic cigarette holders, ceramic pipes and water pipes contained in the seized shipments is to introduce controlled substances into the body." *Id.*, 705 F.Supp. at 1261. Relying on the testimony of experts for both sides, the court concluded that "there [were] minimal, if any, legitimate uses for such items in the community." *Id.* at 1264. In effect, the *57,261 Items* court applied an objective scienter standard. Nowhere was there any consideration of the importer's subjective intent

render acceptable the use of illegal drugs").

regarding the items. The Sixth Circuit, on appeal, implicitly approved the objective approach when it upheld the district court's conclusion that "in this country these items are intended for use with controlled substances." 869 F.2d at 958.

*Hoffman Estates* and *57,261 Items* plainly support an objective scienter standard for § 857. Other decisions appear to point in the opposite direction. Thus, defendants cite to *United States v. Main Street Distributing* and similar decisions involving state or local drug paraphernalia laws and indicating that the applicable scienter under various incarnations of the Model Act must be that of the particular defendant facing trial, not the intent of some other party in the distribution chain of the item in question. *See, e.g., Levas and Levas v. Village of Antioch,* 684 F.2d at 452–53; *Tobacco Accessories, etc. v. Treen,* 681 F.2d 378 (5th Cir.1982); *The General Stores, Inc. v. Bingaman,* 695 F.2d 502 (10th Cir.1982); *Hejira Corp. v. MacFarlane,* 660 F.2d at 1366–67. Close scrutiny reveals these decisions to be inapposite or unpersuasive. Most refer to scienter only in the context of multi-purpose objects, not objects "designed" for use with controlled substances. *See, e.g., Levas and Levas v. Village of Antioch,* 684 F.2d at 453 (stating "scienter is the only practical way of defining when a *multi-purpose object* becomes paraphernalia") (emphasis added); *United States v. Main Street Distributing,* 700 F.Supp. at 667 (quoting multi-purpose object language from *Levas and Levas*); *Tobacco Accessories, etc. v. Treen,* 681 F.2d at 383 (stating that a vendor incurs no liability "unless he believes or intends that the *ambivalent item* will be used" with drugs) (emphasis added). In addition, most of defendants' cases are inapposite because they involved state or local statutes that differ significantly from § 857. For example, in none of defendants' cited cases did any state or local

statute in issue contain an express exemption for tobacco employing the word "traditionally." Most statutes derived from the Model Act also contain terms, absent from § 857, that are highly indicative of subjective intent.[24] *See, e.g., Nova Records, Inc. v. Sendak,* 706 F.2d 782, 784 (7th Cir.1983) (statute makes liable "[a] person who *knowingly or intentionally* manufactures or designs an instrument, device, or other object that he intends to be used primarily" in connection with illegal drugs) (emphasis added); *Hejira Corp. v. MacFarlane,* 660 F.2d at 1362, 1366–67 (stating with regard to state statute that defined drug paraphernalia as any device "primarily *adapted, designed and intended*" for certain purposes, "[t]his phrase in its entirety does not provide objective standards for determining what items fall within the definition") (emphasis added); Model Drug Paraphernalia Act Article II(B), (D) (using term "knowing" in definition of substantive offenses); *see also Murphy v. Matheson,* 742 F.2d 564, 573–74, 579 (10th Cir.1984) (suggesting that subjective intent standard applied to state statute defining drug paraphernalia as any product "used, or intended for use" with illegal drugs but noticeably excluding the phrase "designed for use"). To the extent that these decisions either require the government to prove that a defendant purposefully designed an item for use with illegal drugs or preclude reliance on objective means of proving intent, however, they are inconsistent with the statutory language of § 857 and not persuasive here.

### F. Transferred Intent

■ Defendants suggest that an objective standard implicates the problem of transferred intent. More precisely, defendants fear that if an objective standard is used and their own subjective intent not evaluated, they could be convicted on the basis of the subjective illegal purpose of

---

**24.** It is also significant that the official commentary to the Model Act appears to recognize a role for an objective standard. *See* Comment to Model Act Article I (stating "[o]bjects whose sole, or at least dominant purpose is to produce, package, store, test, or use illicit drugs are considered to be 'designed' for such use. A rebut-

table presumption exists that these objects are intended for use for the purpose for which they are designed. As such, they are presumed to be drug paraphernalia. Isomerization devices designed for use in increasing the THC content of marihuana provide a good example") (citation omitted) (reprinted in Hearings at 187–88).

someone else in the chain of distribution, such as the manufacturer or even a customer. This fear is groundless. To begin with, it is a general principle of criminal law that the pertinent "mens rea" must be that of the criminal defendant. *See, e.g., Pennsylvania Accessories Trade Association, Inc. v. Thornburgh,* 565 F.Supp. 1568, 1576 (M.D.Pa.1983). Moreover, an objective standard does not require or depend upon transferred intent. For example, even if the manufacturer of an item harbors an illicit intent, the retailer of that item will not be convicted under an objective standard if the statutory and other objective factors indicate that the item is not primarily designed or intended to be used with illegal drugs.[25] *See Garner v. White,* 726 F.2d at 1281 (where intent is embodied in objective, structural characteristics of the item such that its purpose must be apparent to the accused through physical characteristics, the scope of a state drug paraphernalia law based on the Model Act excludes "innocuous objects covertly intended for drug use by the designer or manufacturer"). As the *Garner* court explained,

> Convicting persons based on what they should have known about the manufacturer's or designer's intent as revealed by the structural characteristics of a particular object does not present a problem of transferred intent. The intent of the manufacturer or designer is embodied in the object itself and is apparent to all who perceive it. All that is required is for persons to open their eyes to the

"objective realities" of the items sold in their businesses.

*Id.* at 1282 n. 8 (quoting *The Casbah, Inc. v. Thone,* 651 F.2d 551, 561 (8th Cir.1981), *cert. denied,* 455 U.S. 1005, 102 S.Ct. 1642, 71 L.Ed.2d 874 (1982)); *see also Stoianoff v. State of Montana,* 695 F.2d at 1219 (stating that determination of drug paraphernalia by reference to objective criteria presents no danger of transferred intent) (citing *Hoffman Estates*). In short, where, as here, the statute employs an objective scienter standard, a defendant's subjective intent is not at issue. Accordingly, there is no occasion for the operation of transferred intent.

## G. Derivative, Multi-Use Items

■ Items of drug paraphernalia may be seen to fall into two broad categories: (1) "hard core" items and (2) "derivative" items. The former category consists of items such as those listed in § 857(d), namely bongs, chillums and the like. These items have no non-contrived use except as drug paraphernalia. Derivative items are items that may be manufactured for legitimate use, but are, as a matter of fact, marketed for use with illegal drugs. These derivative items of drug paraphernalia, such as razor blades, scales, or spoons, have no objective design features linking them exclusively to drugs; they are capable of both lawful and unlawful use, but in fact are commonly used in the American drug culture.[26] Congress knew this, and it plainly could not have intended to exempt them from the scope of the Act.[27]

---

**25.** As an illustration, a manufacturer may intend that a scale be used to weigh cocaine, but the retailer would not be convicted where (i) he was a licensed chemist, (ii) advertising of the product was connected only to scientific or medical purposes, (iii) the scale has legitimate uses in the community and is not displayed with any prohibited items, and (iv) expert testimony confirms its utility and routine use in a medical laboratory. *See* 21 U.S.C. § 857(e).

**26.** *See also Tobacco Accessories, etc. v. Treen,* 681 F.2d at 383 ("intended for use" language in state statute applies to "ambivalent" items); Hearings at 69 (testimony of Harry Myers) (stating "[a] single-edged razor blade is not designed for use with drugs, but it certainly is capable of doing certain things with cocaine. Miniaturized

spoons are not designed for use to snort cocaine, in most instances, but they certainly can be used to snort cocaine. Those types of items that don't have inherent design characteristics that say that they are intended for use with drugs, you call derivative drug paraphernalia, they can only be controlled by the lawmakers if the person who is charged with an offense can be shown to have intended that item for an unlawful use").

**27.** *Cf.* Hearings at 68 (testimony of Model Act principal author Harry Myers that Model Act was designed *to pursue both items designed for use with illegal drugs and multipurpose items that are marketed or promoted for an illicit use). See also* discussion of legislative history, *supra.*

Contrary to defendants' claim, the inclusion of derivative drug paraphernalia items within the scope of the Act does not contradict an objective scienter standard. Multiuse items can only be identified as drug paraphernalia by means of objective factors, for the government reasonably cannot be expected to divine a defendant's hidden purpose. Consequently, the nature of the ambiguous item can best be demonstrated circumstantially by way of objective facts and circumstances. This is precisely the approach of § 857. Section 857(e) lists eight factors, objective in nature, that may be applied to the determination whether a derivative item is prohibited drug paraphernalia.

## H. Summary

In sum, § 857's language, structure and purpose compel the conclusion that the statute incorporates an objective scienter standard with respect to the definition of "drug paraphernalia." The government may win a conviction without proof that a defendant subjectively designed or intended the charged items to be used with illicit drugs. It is enough that the government, on this element of the offense, prove beyond a reasonable doubt that the charged items, by virtue of their objective charac-

teristics, manner of sale, advertising and the like, are § 857 drug paraphernalia and that defendant was aware of the general character and nature of the items.[28] Under an objective standard, a jury would be instructed, *inter alia,* that it need not find that a defendant subjectively intended that a charged item be used with illegal drugs in order to convict.

## I. Advice of Counsel Defense

■ Consistent with this construction of § 857, the Court granted the government's motion *in limine* excluding advice of counsel evidence.[29] Although the arguments at bar were less than clear, defendants apparently sought to submit evidence of advice of counsel for several purposes, including (1) to establish an advice of counsel defense to the alleged violation of § 857, and (2) to show the unconstitutional vagueness of § 857.[30] In general, an advice of counsel defense applies only where the violation requires proof of specific intent, that is, proof that a defendant has actual knowledge that his conduct is illegal.[31] Section 857, contrary to defendants' contention, requires no such proof. Instead, the statute's objective scienter requirement permits the government to prove by objective evidence that an item is proscribed drug

28. This type of general criminal intent is analogous to that required in the obscenity context, where the government need demonstrate only that a defendant knows the general nature of the product, and not whether the item is legally obscene. *See, e.g., Hamling v. United States,* 418 U.S. 87, 123, 94 S.Ct. 2887, 2910–11, 41 L.Ed.2d 590 (1974).

29. In so ruling, however, the Court added that defendants had leave to renew their offer of this evidence should circumstances at trial indicate its admissibility on grounds not dealt with *in limine.*

30. Defendants also apparently contended that evidence of advice of counsel was relevant to show that defendants subjectively intended the items they sold to be used with tobacco, not illicit drugs. Even assuming that a defendant's subjective intent were relevant, counsel's advice would have very little probative value in this respect. For example, evidence that counsel advised defendants that § 857 contained a subjective intent requirement, or that they would not violate § 857 if they intended their items to

be used with tobacco, tells little about what defendants actually intended. At the same time, evidence of advice of counsel would be highly prejudicial because it would confuse a jury by leading it to believe that § 857 employs a scienter requirement of willfulness or of subjective intent to sell an item for use with controlled substances. In sum, advice of counsel evidence in this context is excludable under Rules 402 and 403, Fed.R.Evid.

31. The phrase "specific intent" has been accorded various meanings. *See Liparota v. United States,* 471 U.S. at 433 n. 16, 105 S.Ct. at n. 16 (observing that "specific intent" instructions "have been criticized as too general and misleading" and that "[a] more useful instruction might relate specifically to the mental state required under [the statute at issue] and eschew use of difficult legal concepts like 'specific intent' and 'general intent'"); *United States v. Bailey,* 444 U.S. 394, 403–04, 100 S.Ct. 624, 631–32, 62 L.Ed.2d 575 (1980) (listing various meanings given by courts to "specific intent"). Here, specific intent means actual belief that one's conduct is illegal.

paraphernalia. Under § 857, the jury need not find that a defendant specifically knew that the item was drug paraphernalia. In these circumstances, advice of counsel that the item was not drug paraphernalia is no defense.[32]

 Defendants also sought to submit evidence that their counsel advised them that § 857 was unconstitutionally vague, and that the statute would also be ruled unconstitutional if found not to require proof of a subjective intent to sell items for use with drugs. This evidence is similarly irrelevant and inadmissible. A good faith belief that a statute is unconstitutional is no defense to a charge of violating that statute, even where the statute contains, as an essential element, a requirement that a defendant willfully intend to engage in unlawful activity. *United States v. Kraeger,* 711 F.2d 6, 7 (2nd Cir.1983) ("a good faith belief that a law was unconstitutional was no defense to the charge of failing to file an income tax return"); *United States v. Ware,* 608 F.2d 400, 405 (10th Cir.1979). A claim that a law is unconstitutional constitutes disagreement with the law, not a mistake of law. And such a disagreement, no matter how earnestly held, is no defense. *United States v. Ware,* 608 F.2d at 405 ("[i]t should be pointed out, however, that neither a defendant's disagreement with the law, nor his own belief that such law is unconstitutional—no matter how earnestly held—constitute a defense of good faith misunderstanding or mistake"). Hence, evidence that defendants received advice from counsel that § 857 was uncon-

stitutional is irrelevant to establishing a defense to the alleged § 857 violations.

### III. *Vagueness*

Section 857, construed to include an objective scienter standard, is attacked by defendants as unconstitutionally vague. Defendants' briefs apparently foreswear any facial challenge, arguing exclusively that the statute is unconstitutionally vague as applied. But because claims of facial vagueness were made in oral argument, both grounds of attack are addressed here. In essence, § 857 is not unconstitutionally vague, either facially or as applied.

The void for vagueness doctrine, a component of due process, requires that a penal statute "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). Vagueness challenges generally require two inquiries: first, does the law "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"; and second, does the law "provide explicit standards for those who apply them." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972).

### A. Facial Vagueness

 *Hoffman Estates* teaches that courts deciding facial vagueness challenges should first determine whether the enactment at issue implicates constitutionally

---

**32.** *United States v. Powell,* 513 F.2d 1249, 1251 (8th Cir.) (upholding trial court's decision not to give advice of counsel instruction to jury and observing that such instruction "is warranted only where the crime charged involves willful and unlawful intent"), *cert. denied,* 423 U.S. 853, 96 S.Ct. 99, 46 L.Ed.2d 77 (1975); *United States v. Lord,* 710 F.Supp. 615, 617 (E.D.Va.1989) ("[b]ecause the ... charge does not require proof of specific intent, the defendant was not entitled to an instruction on the defense of advice of counsel"), *aff'd,* 902 F.2d 1567 (4th Cir. 1990); 1 E. Devitt & C. Blackmar, Federal Jury Practice and Instructions § 16.15 (2d ed. 1970) (an advice of counsel instruction "is appropriate only in a limited class of cases, in which willful

action is an essential element and legal problems are present"); *see United States v. Miller,* 658 F.2d 235, 237 (4th Cir.1981) ("[t]he reliance defense, urged most frequently in tax evasion cases, is designed to refute the government's proof that the defendant intended to commit the offense"); *United States v. Polytarides,* 584 F.2d 1350 (4th Cir.1978) ("[t]he basis for the defense of action taken on the advice of counsel is that, in relying on counsel's advice, defendant lacked the requisite intent to violate the law"); *United States v. Smith,* 523 F.2d 771, 778 (5th Cir.1975) ("[t]he reliance defense serves the purpose of negating intent to commit an offense"), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976).

protected conduct; then, assuming it does not, courts should uphold the challenge only if the enactment is impermissibly vague in all applications. *See* 455 U.S. at 494–95, 102 S.Ct. at 1191–92.[33] To show facial vagueness, "[t]he complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. *Coates v. City of Cincinnati,* 402 U.S. 611, 614 [91 S.Ct. 1686, 1688, 29 L.Ed.2d 214] (1971). Such a provision simply has *no core.'* *Smith v. Goguen,* 415 U.S. 566, 578 [94 S.Ct. 1242, 1249–50, 39 L.Ed.2d 605] (1974)." *Hoffman Estates,* 455 U.S. at 495 n. 7, 102 S.Ct. at 1191 n. 7. Measured by this standard, § 857 easily passes constitutional muster.

First, defendants do not contend that § 857 implicates constitutional rights such as freedom of speech. Nor can they argue that the statute has no core of identifiable prohibited conduct. Section 857 defines as drug paraphernalia only those items "primarily intended or designed" for use with illegal drugs. In addition, the statute lists fifteen examples of hard core drug paraphernalia that anyone familiar with this country's drug culture would recognize,[34] and it excludes items "traditionally intended for use" with tobacco. In short, the existence of a clear core of prohibited conduct cannot seriously be doubted. This, combined with the objective scienter standard, defeats a facial vagueness attack, as the "interaction of definition and intent allays vagueness." *Levas and Levas v. Village of Antioch,* 684 F.2d at 453. At worst, the statute's line of demarcation between drug paraphernalia and innocent items may blur at the margins. But this is not fatal, for "[a] finding of unconstitutional vagueness cannot be based on uncertainty at the margins, or on a parade of bizarre

hypothetical cases: problems of that order can be resolved in challenges as applied." *Levas and Levas v. Village of Antioch,* 684 F.2d at 451 (citations omitted). Not surprisingly, therefore, the Supreme Court in *Hoffman Estates* explicitly upheld similar "designed for use" language against a facial vagueness challenge. *See* 455 U.S. at 500–502, 102 S.Ct. at 1194–95. And courts considering drug paraphernalia statutes based on the Model Act routinely uphold these statutes against facial vagueness challenges. *See Garner v. White,* 726 F.2d at 1279 & n. 5 (citing cases). Consistent with this uniform authority, this Court concludes that Section 857 is not impermissibly vague on its face.

**B. Vagueness As Applied**

Defendants' vagueness as applied argument rests on three grounds: (1) lack of fair notice, (2) risk of arbitrary enforcement, and (3) actual arbitrary enforcement in the case at bar. The statute's detail and structure, however, contradict defendants' claim that § 857 fails to provide fair notice of what conduct is proscribed. There is little doubt that the statute, as a whole, provides reasonable and "ascertainable standards of guilt." *Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948). Other courts have easily reached the same result. *See United States v. 57,-261 Items of Drug Paraphernalia,* 869 F.2d 955 (6th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989) (§ 857 not vague either on its face or as applied). To begin with, it is established that the presence of a scienter requirement acts to mitigate a law's vagueness. *See Hoffman Estates,* 455 U.S. at 499, 102 S.Ct. at 1193–94, *Liparota v. United States,* 471 U.S. at 427, 105 S.Ct. at 2089 (mens rea requirement "ensures that criminal statutes will provide fair warning con-

---

**33.** In contrast, courts apply more exacting scrutiny when reviewing laws that regulate basic constitutional rights such as First Amendment freedoms. *See, e.g., Kolender v. Lawson,* 461 U.S. at 357, 103 S.Ct. at 1858; *Colautti v. Franklin,* 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979).

**34.** *See, e.g.,* Comment to Model Act Article II (stating that "'chillums' and 'bongs' may seem foreign to the lay reader. Nevertheless, these terms are part of the jargon of the drug culture and are understood by both users and merchants of drug paraphernalia"), reprinted in Hearings at 188.

cerning conduct rendered illegal"); *cf. Hamling v. United States*, 418 U.S. at 123, 94 S.Ct. at 2910–11 (mens rea requirement in obscenity context). Nor is this mitigating effect lost because the scienter requirement is objective in nature. For example, in *Hoffman Estates* the Supreme Court explained that the phrase "marketed for use," was not impermissibly vague when taken in conjunction with guidelines that referred to objective characteristics such as the manner of display and proximity to uncovered items. *See Hoffman Estates*, 455 U.S. at 502, 102 S.Ct. at 1195.

Also mitigating against vagueness is the statute's list of fifteen examples of drug paraphernalia, to which potential defendants may refer as guideposts to prohibited conduct. "The list of examples provided lends greater definiteness to the statute and enhances, rather than diminishes, the notice of proscribed conduct." *Murphy v. Matheson*, 742 F.2d at 572. It is difficult to imagine how Congress might have been more specific without providing an exhaustive description of every prohibited item, a catalogue that would have made the statute unwieldy. In *Hoffman Estates*, the Supreme Court found that the phrase "designed for use" was not ambiguous when accompanied by guidelines that referred to specific items as drug paraphernalia. *See* 455 U.S. at 500–501, 102 S.Ct. at 1194–95. As an illustration, the Court expressly found that the phrase "roach clips" was not ambiguous "because that technical term has sufficiently clear meaning in the drug paraphernalia industry" and is susceptible to easy identification. *See id.* at 501 n. 18, 102 S.Ct. at 1194 n. 18. To be sure, some residual ambiguity may persist at the margins. But this relatively minor residual ambiguity does not mean that the statute fails to provide sufficient notice to pass the constitutional vagueness test. Some ambiguity is inevitable in drawing statutory lines and, as the Supreme Court has noted in the obscenity context, this is not enough to sustain a vagueness challenge. The Court put this point as follows:

> Whenever the law draws a line there will be cases very near each other on opposite sides. The precise course of the line may be uncertain, but no one can come near it without knowing that he does so, if he thinks, and if he does so it is familiar to the criminal law to make him take the risk.

*Hamling v. United States*, 418 U.S. at 124, 94 S.Ct. at 2911 (quoting *United States v. Wurzbach*, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930)). *See also United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541–42, 91 L.Ed. 1877 (1947) (existence of marginal cases is not sufficient reason to hold statutory language too ambiguous to define a criminal offense.)

Nor does § 857 permit arbitrary enforcement.[35] It does not grant law enforcement officers so much flexibility as to leave them without guidance or unconstrained. The definition of "drug paraphernalia" coupled with the listing of fifteen exemplary items adequately limits enforcement discretion. It makes Congress' intent concrete and identifies certain physical characteristics that law enforcement officers may use to distinguish legitimate items from drug paraphernalia. *See United States v. Glass Menagerie, Inc.*, 721 F.Supp. 54, 60 (S.D.N.Y.1989) (description of "crack pipes" and "carburetor pipes" sufficient to enable experienced agents to distinguish between legitimate and illegitimate use). Moreover, the eight factors that agents, prosecutors, and courts may consider in determining whether an item is drug paraphernalia provide yet additional guidance for and constraints on law enforcement officials. Several courts have relied on these or similar factors derived from the Model Act in find-

---

**35.** Arbitrary enforcement is "enforcement that leaves to the arresting officer or prosecutors the job of determining, essentially without legislative guidance, what the prohibited offense is." *Record Head Corp. v. Sachen*, 682 F.2d 672, 678 (7th Cir.1982). The vagueness doctrine does not invalidate any law that could have been drafted more precisely. "[T]he practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340, 72 S.Ct. 329, 330–31, 96 L.Ed. 367 (1952). Law enforcement authorities must be permitted some flexibility and room for judgment. *See Grayned v. City of Rockford*, 408 U.S. at 114, 92 S.Ct. at 2302.

ing that drug paraphernalia statutes posed no substantial risk of arbitrary enforcement. *See, e.g., Garzon v. Rudin,* No. 87–C–1046, slip op. at 15 (E.D.Wis. February 2, 1990) (§ 857 factors); *Ryers Creek Corp. v. MacMartin,* No. 89–157T, slip op. at 8–12 (W.D.N.Y. April 20, 1989) (applying ratio of sales, legitimate uses, expert testimony, and other factors); *New England Accessories Trade Ass'n v. City of Nashua,* 679 F.2d 1, 6 (1st Cir.1982) (factors in local drug paraphernalia ordinance provide "valuable guides in determining what items are prohibited"). "[T]aken as a whole they serve to channel enforcement activities by providing objective measures for the evaluation of specific factual situations." *Murphy v. Matheson,* 742 F.2d at 574.

Finally, the exception for items "traditionally intended for use with tobacco products" in § 857(f)(2) provides further legislative guidance. It serves to narrow the scope of the statute and caution law enforcement officers against mistakenly identifying tobacco products as drug paraphernalia. In sum, § 857's structure and detail provide adequate safeguards against the risks of arbitrary enforcement. *See, e.g., United States v. 57,261 Items of Drug Paraphernalia,* 869 F.2d at 957–58 (court relied on *Hoffman Estates* in concluding that § 857 was not vague either on its face or as applied).

■■■ Defendants' final vagueness argument rests on the assertion that government agents executing similar § 857 search warrants in this case did not invariably seize the same items. Specifically, certain items were seized from some of defendants' locations but not seized at other sites. This does not establish fatal vagueness. For example, an item may be subject to seizure in one context but not another because the statute makes context relevant. *See* 21 U.S.C. § 857(e). In any event, "the fact that different minds may reach different results in applying the standards to a particular case does not render the statute void for vagueness." *Pennsylvania Accessories Trade Assoc., Inc. v. Thornburgh,* 565 F.Supp. at 578 (citing *The General Stores, Inc. v. Bingaman,* 695 F.2d at 504); *accord, Hejira Corp. v. MacFarlane,* 660 F.2d at 1367 (stating "it is not necessary for reasonable men to consistently reach the same conclusion in applying objective standards to a given factual situation"). "The Constitution prohibits arbitrary and discriminatory enforcement; it does not insist upon mathematical certainty." *United States v. Main Street Distributing,* 700 F.Supp. at 669.

### IV. *Retailers*

■■■ Defendant retailers sought dismissal of the indictment against them on the ground that § 857 does not reach their conduct, but focuses instead solely on mail order sellers. This argument is meritless. Section 857(a)(1) states that "[i]t is unlawful *for any person*—(1) to *make use* of the services of the Postal Service or other interstate conveyance *as part of a scheme* to sell drug paraphernalia." (Emphasis added.) This language is general and deliberately expansive; no class of persons or group of entities is excluded. The statute, the terms of which must be given their plain and ordinary meaning,[36] reaches "any person," whether or not a retailer, who makes use of the mails or other interstate conveyance "as part of a scheme" to sell drug paraphernalia.[37] This is precisely what the indictment charges. Specifically, the indictment alleges that defendant retailers received drug paraphernalia and in-

---

**36.** *See Andrews v. United States,* 817 F.2d 1277, 1279 (7th Cir.1987) ("use" appearing in statute pertaining to "use" of communication facility to commit drug crime, 21 U.S.C. § 843(b), must be given its ordinary meaning and includes *receiving* as well as *placing* telephone calls), *cert. denied,* 484 U.S. 857, 108 S.Ct. 166, 98 L.Ed.2d 120 (1987); *United States v. Rodriguez–Ramirez,* 777 F.2d 454, 457 (9th Cir.1985) (same); *United States v. Cordero,* 668 F.2d 32, 43 n. 16 (1st Cir.1981) (same).

**37.** In addition, other provisions of § 857 besides those already noted also suggest that the statute's scope reaches more than mail order sellers of paraphernalia and in fact encompasses retailers. *See, e.g.,* § 857(e)(4) (referring to "manner in which the item is displayed"); § 857(e)(5) (referring to "owner or anyone in control of the item" and "licensed distributor or dealer of tobacco products").

voices for that paraphernalia through the Postal Service and other interstate conveyances and in other ways used such conveyances in furtherance of a scheme to sell drug paraphernalia. Where, as here, the statutory language is clear, that is the end of the matter. *Sullivan v. Stroop,* 110 S.Ct. at 2502.

The defendant retailers seek to avoid the plain language of the statute by arguing that the legislative history indicates that Congress intended § 857 to be "specifically directed" solely against mail order sellers of drug paraphernalia. *See* defendant retailers' Memorandum in Support of Motion to Dismiss at 5. In support, defendants cite various isolated statements in the legislative history generally to the effect that the statute reaches mail order sellers of drug paraphernalia. To be sure, these statements are accurate as far as they go, for the statute plainly reaches mail order purveyors of drug paraphernalia. But nothing in any of the cited passages states that the statute's reach is limited to mail order sellers. Such a result, as noted, runs counter to the statute's plain language. And as noted *supra,* snippets of ambiguous legislative history cannot override the statutory language. *See In re Kelly,* 841 F.2d at 912 n. 3; *South Carolina Educ. Ass'n v. Campbell,* 883 F.2d 1251, 1261–62, *cert. denied,* —— U.S. ——, 110 S.Ct. 1129, 107 L.Ed.2d 1035 (1990). Defendants' interpretation also conflicts with the overall statutory purpose of waging an attack on the drug paraphernalia industry as a whole. *See* Part II.D., *supra.* In sum, there is no warrant for dismissing the indictment against the retailers.

## V. *Multiplicious Counts*

Defendants claim that Counts 150–238 of the indictment are multiplicious. *See United States v. Israelski,* 597 F.2d 22, 24 (2d Cir.1979) (multiplicity is "the charging of a single offense in more than one count"). Counts 150–238 charge each defendant with multiple violations of § 857(a)(2), which makes it unlawful for a person "to offer for sale and transportation in interstate or foreign commerce drug parapher-

nalia." Each of Counts 150–238 is based on an invoice showing that a particular defendant wholesaler shipped items alleged to be drug paraphernalia to particular defendant retailers. The government argues that each invoice shows an acceptance by a retailer of an "offer for sale" by a defendant wholesaler. Defendants argue that Congress did not intend § 857(a)(2) to punish a company for each "sale" or "distribution" of paraphernalia made as part of an ongoing business relationship; rather, the intent was to punish a defendant once for offering to sell drug paraphernalia to a particular party. The issue is the appropriate "unit of prosecution" under § 857(a)(2).

The allowable unit of prosecution for a federal offense is a matter within the discretion of Congress, subject only to constitutional limitations, primarily the Eighth Amendment's prohibition against cruel and unusual punishment. *Bell v. United States,* 349 U.S. 81, 82, 75 S.Ct. 620, 621–22, 99 L.Ed. 905 (1955). The appropriate unit is determined from the text of the statute itself or, failing that, from the legislative history and overall statutory scheme. *United States v. Elliott,* 849 F.2d 886, 889 (4th Cir.1988). Here, the statute states that it is unlawful for any person "to offer for sale or transportation" drug paraphernalia. No further definition of the term "offer" is given. While the Court "cannot in fairness say that the statutory language itself specifically forecloses" defendants' broader reading of § 857(a)(2), *Elliott,* 849 F.2d at 889, an examination of the legislative history and statutory scheme persuasively suggests that Congress intended to reach *each* "offer" for sale made by a defendant, including separate offers occurring in the context of an existing business relationship. The legislative history and statutory scheme evince a desire to punish each "sale" of drug paraphernalia and to reach each individual "use" of the mails or other interstate conveyances.[38] It follows that Congress also sought to punish each "offer" made by a defendant to a party, even a party with whom defendant had dealt previously and

---

**38.** The intention clearly was to reach individual sales of paraphernalia and individual uses of the mails and other means of interstate conveyance. Senator Robert Dole explained that "the Mail

hence had a business relationship. To permit a defendant to avoid separate punishment for multiple agreements with the same buyer over an extended period would be inconsistent with Congress' plainly expressed purpose to deter and stop interstate trade in drug paraphernalia. *Cf. Elliott*, 849 F.2d at 890 (holding that adopting a broad "transactional interpretation of the term 'distribute' would be inconsistent with Congress' intent to expand the scope of the conduct punishable under [21 U.S.C.] § 841(a)(1)").

Nothing in the record suggests that each invoice may not represent a separate offer and agreement between defendants.[39] In some instances, evidence at trial may indicate that separate invoices do not represent separate offers and agreements. But at this pretrial stage of the proceeding, nothing bars the government from attempting to prove, as the indictment alleges, that each invoice represents a separate offer prohibited under the Act.

### VI. *Grand Jury Abuse*

Several defendants moved jointly to dismiss the indictment for reasons of grand jury abuse. They argued that the indictment should be dismissed because the

grand jury's independent judgment was subverted in two respects: 1) the prosecutor interrogated witnesses in a manner that inflamed the grand jury against defendants; and 2) the government failed to present certain exculpatory evidence to the grand jury. It is established that dismissal of an indictment for non-constitutional error such as prosecutorial misconduct is appropriate only if the claimed violations substantially influenced the grand jury's decision to indict, or if there is grave doubt as to whether they had such effect. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring). Neither is true here. The Court, having reviewed *in camera* extensive portions of the grand jury transcript, concludes, without grave or significant doubt, that the alleged prosecutorial conduct did not significantly influence the grand jury's decision to indict.[40]

#### A. Questioning of Witnesses

██ By order dated August 2, 1990, the Court required the government to produce

---

Order Drug Paraphernalia Control Act prohibits the *sale* and transportation of drug paraphernalia through services of the postal service or in interstate commerce." 132 Cong.Rec. S 13779 (Sept. 26, 1986) (emphasis added). Congressman Mel Levine observed with reference to the purpose of a predecessor bill:

> Drug paraphernalia *sales* are now made *by the mail* or by private package services such as UPS. The unregulated sales of drug paraphernalia through the mail and interstate commerce glamorizes the drug culture and encourages drug experimentation by children and adolescents.

Hearings at 19 (emphasis added); *see also* 132 Cong.Rec. S 13463 (Sept. 23, 1986) (Mail Order Drug Paraphernalia Control Act "prohibits the sale and transportation of drug paraphernalia ... in interstate commerce").

**39.** The government alleges, for example, that the invoices contain differing price, item ordered, and volume discount terms, indicating separate offers, negotiations, and agreements. Government's Consolidated Response to Defendants' Motions at 148.

**40.** By order dated September 14, 1990, the Court also denied defendant Robert T. Vaughn's oral

motion for a stay of trial pending appeal pursuant to Rule 8(a), Fed.R.App.P. It is established that a court's decision whether to grant a stay under Rule 8(a) is governed by four factors: 1) whether the stay applicant has made a strong showing of likely success on the merits; 2) whether the applicant will suffer irreparable injury absent a stay; 3) whether issuance of a stay will injure other parties to the proceeding; and 4) how issuance of a stay will affect the public interest. *See Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *see generally* 11 C. Wright & A. Miller, Federal Practice & Procedure § 2904 (1973).

At least two of these factors weigh decisively against the issuance of a stay. First, as explained above the Court is persuaded that defendant has no reasonable probability of success on the merits of the grand jury abuse claim. Second, the public interest would not benefit from a stay. The delay caused by a stay can only work against society's "interest in the prompt administration of justice," *United States v. Mechanik*, 475 U.S. at 72, 106 S.Ct. at 942 (quoting *United States v. Hastings*, 461 U.S. 499, 509, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)).

Considering these together with the other factors, the probability of success on the merits being most influential, *Garcia–Mir v. Meese*, 781

for *in camera* review the complete grand jury testimony of the witnesses named in the defendants' grand jury abuse motion. Having reviewed the transcripts for each witness,[41] the Court concludes that the prosecutor's manner of interrogation, while arguably inappropriate in some instances, *see United States v. Mandel,* 415 F.Supp. 1033, 1042 (D.Md.1976) (prosecutors' remarks suggesting witness is lying risk prejudice of grand jury), did not unfairly prejudice this grand jury against defendants. Nor does the Court harbor grave doubt, or indeed any doubt, that the grand jury might have been substantially influenced by the questioning. On the contrary, the Court is persuaded that the government presented ample evidence from which the grand jury could find probable cause to believe that defendants committed the crimes alleged in the indictment. Under these circumstances, dismissal is not required. *See United States v. Trass,* 644 F.2d 791, 796 (9th Cir.1981) (stating that "dismissal of an indictment is required only in flagrant cases in which the grand jury has been overreached or deceived in some significant way") (quoting *United States v. Thompson,* 576 F.2d 784, 786 (9th Cir. 1978)).

## B. Exculpatory Material

 As a general matter a federal prosecutor is not obligated to present exculpatory evidence to the grand jury. *See, e.g., United States v. Adamo,* 742 F.2d 927 (6th Cir.1984), *cert. denied sub nom. Freeman v. United States,* 469 U.S. 1193, 105 S.Ct. 971, 83 L.Ed.2d 975 (1985); *United States v. Y. Hata & Co.,* 535 F.2d 508 (9th Cir.), *cert. denied,* 429 U.S. 828, 97 S.Ct. 87, 50 L.Ed.2d 92 (1976); *United States v. Ruyle,* 524 F.2d 1133 (6th Cir.1975), *cert. denied,* 425 U.S. 934, 96 S.Ct. 1664, 48 L.Ed.2d 175 (1976). "The function of a grand jury is

investigative. Its proceedings are not adversary in nature, but rather consist of inquiries conducted by laymen without resort to the technicalities of trial procedure." *United States v. Ruyle,* 524 F.2d at 1135. *See also Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 408–09, 100 L.Ed. 397 (1959) (indictment returned by legally constituted and unbiased grand jury, if valid on its face, is sufficient for purposes of Fifth Amendment). Only a failure to present evidence that directly negates a target's guilt constitutes grand jury abuse. *See, e.g., United States v. Dorfman,* 532 F.Supp. 1118, 1133 (N.D.Ill.1981) (failure to present evidence that "clearly negates the target's guilt" is abuse of prosecutor's power); *United States v. Olin Corp.,* 465 F.Supp. 1120, 1127–28 (W.D.N.Y.1979) (evidence that "clearly negates guilt"); *cf. In re Special April 1977 Grand Jury,* 587 F.2d 889, 893 (7th Cir.1978) (noting that United States Attorney's manual directs federal prosecutors to present to grand jury "substantial evidence directly exculpating" a target).

 The Court concludes, having reviewed the evidence cited by defendants, that this alleged exculpatory evidence does not directly negate any inference of guilt. At best, some of the evidence may cast doubt on the wisdom or clarity of § 857; at worst it is irrelevant. For example, defendants urge that the government should have submitted to the grand jury a thirty-six-page United States International Trade Commission report ("ITC Report") on the effectiveness of § 857.[42] The ITC Report appears to criticize the statute's definition of "drug paraphernalia" as "ambiguous" and "nebulous", but it in no way establishes defendants' innocence of crimes under the statute. *See In re Grand Jury 89-2,* 728 F.Supp. 1269, 1274 (E.D.Va.1990).

---

F.2d 1450, 1453 (11th Cir.1986), *cert. denied,* 479 U.S. 889, 107 S.Ct. 289, 93 L.Ed.2d 263 (1986) the Court concluded that the balance of factors did not warrant a stay.

**41.** These witnesses and the dates of their testimony are Kathleen Cutler (1/30/90, 1/31/90); Marc Biales (5/22/90); Lorraine Shapiro (3/29/90); Elaine Stockton (2/1/90, 2/23/90);

Floyd Crow (4/18/90); and Joanne Raiselis (11/7/89).

**42.** United States International Trade Commission, *Introduction of Certain Drug Paraphernalia Into the United States,* Report to the Committee on Finance, United States Senate, on investigation No. 332–277 under Section 332 of the Tariff Act of 1930 (1989).

Defendants' reference to the deposition of United States Attorney Henry Hudson and the opinion of Judge Bryan in *Virginia Tobacco Accessories Trade Association, et al. v. John Dalton, et al.*, No. 81–0611–1 (E.D.Va.1982) as exculpatory evidence is equally weak. That case involved the constitutionality of a Virginia drug paraphernalia statute and in no way addresses the conduct of these defendants under § 857. At most, these materials suggest that the definition of "drug paraphernalia" in the Virginia statute was unclear or may have embodied a subjective scienter standard.

Defendants next object that the government did not present the testimony of witness Cathy Cutler on the subject of a 1963 report by the National Cancer Institute on Syrian water pipes. This study apparently concluded that tobacco smoke filtered through a Syrian or oriental water pipe is significantly less carcinogenic than smoke from standard pipes, cigarettes, and cigars. Again, this testimony hardly serves to exculpate defendants: the general efficacy of Syrian water pipes in filtering tobacco smoke bears little, if any, relationship to the question whether probable cause existed to believe that defendants were engaged in the manufacture, importation, distribution, or sales of drug paraphernalia. An item having some use with tobacco may still constitute drug paraphernalia under § 857. In any event, the substance of the study was effectively before the grand jury in the form of a label, affixed to certain of defendants' merchandise, which recited the study's conclusion that Syrian water pipes affected a roughly 50% decrease in the carcinogenity of tobacco smoke.

Finally, defendants object to the government's failure to call William Nunnelly or Rick Rowland before the grand jury. Defendants make no showing, however, that the testimony of these individuals would have been exculpatory; rather, defendants only speculate as to what these witnesses might have said. Defendants' related contention that the government did not call Nunnelly or Rowland because it knew that they had passed polygraph examinations, even if true, does not establish exculpatory evidence. The fact that potential witnesses have passed polygraph examinations does not compel the government to submit their testimony to the grand jury. The government need not call all available witnesses before the grand jury, even if some of them might serve to weaken the government's case. *See, e.g., United States v. Eucker*, 532 F.2d 249, 255–56 (2d Cir.1976).

Appropriate orders have issued.

1302

APPENDIX A

TRADE ASSOCIATION

ROBERT T. VAUGHN
Executive Director/Legal
Advisor of the APTC

AMERICAN PIPE & TOBACCO
COUNCIL,
a/k/a American Businesses
for Constitutional
Rights.

------ MANUFACTURERS

PROGRESSIVE PLASTICS, INC.,
a/k/a U.S. Waterpipes,
a/k/a U.S. Bongs.

ODYSSEY GLASS CORPORATION,
a/k/a Toker Products.

LYNX ENTERPRISES, INC.,
d/b/a Electromax,
d/b/a North American
Distributing Co., Inc.,
a/k/a Apogee.

PETER R. WOLFE, President

CHRYSSA E. WOLFE,
Corporate Secretary

ROGER GRAHAM, President/Owner

BARBARA M. GRAHAM, Corporate
Secretary and Treasurer

SEYED-ALI MORTAZAVI, President,
Director & Co-owner, NADC

LYNN K. MORTAZAVI, Vice-President,
Secretary/Treasurer,
Director & Co-owner, NADC

------ WHOLESALER

TOBACCO ACCESSORIES
DISTRIBUTING COMPANY,
d/b/a Choice Supply, Inc.,
a/k/a High Supply.

RANDALL K. DYER, President and
Owner, Choice Supply

------ RETAILERS

RPM ASSOCIATES, INC.,
d/b/a The Penguin Feather

PAGE E. WIENCEK,
President/Owner

WILLIAM L. Love,
d/b/a Octopus Garden

DRAGON SONG, LTD.,'
a/k/a Panama Red, Inc.

JOHN BURGESS, President
Secy/Director, Owner